Good morning, Your Honors. Donald Horgan here on behalf of Petitioner Yancey. Your Honors, in this habeas case, as you know, the State Court of Appeal found two established federal constitutional errors, the first having to do with a brutal violation that occurred when the redacted statement of Mr. Yancey's co-defendant, Ellard, was put into evidence by Mr. Ellard's counsel, disclosed to the jury, told the jury that Mr. Yancey had been outside the victim's apartment at the time of the killing. There was no other evidence of nearly that powerful an order. It was that the- That isn't evidence, is it, either? I'm sorry, Your Honor? That isn't evidence, either. Well, the- That's counsel's statement. It is counsel's statement, Your Honor, but- And if we had the jury instructions, they'd probably say, don't believe anything the counsel says. That's not evidence. Well, as with any – in any – I think the whole rationale behind Bruton, Your Honor, is that there are certain statements that even when – there are certain statements that when redacted, redactions will not do. There are certain instructions under Richardson where the instructions will be ineffective to confine evidence to one – to one defendant or the other. The point is that as the State court found, this was a Bruton violation. Well, the State court found it a violation, and then the State court found there was harmless error. And they found harmless error, frankly, because if one – one could postulate, if one looks at the – looks at the instructions given to the jury, one wouldn't have looked at that evidence in any – or that, quote, unquote, evidence in any effect. But I think the point that – the whole purpose of the redaction, Your Honor, is that – that if you let such a statement get in front of the jury, instructing the jury that they should not consider it against the other defendant will never be effective because it's – Well, if it comes in as evidence, that's absolutely true. There's no question. But if it comes in as counsel's statement and counsel's making argument, not really doing anything to add to the evidence there, it may not be as effective. But I would – I would submit, Your Honor, that particularly where – where the jury has in front of it a purportedly redacted statement, counsel gets it out there that the redaction refers to Mr. Yancey, and then the prosecutor capitalizes on that, as he did, by pointing out to jurors that, in fact, these defendants accused one another and that Mr. Eller's counsel had done a better job of prosecuting – prosecuting or as good a job of prosecuting Mr. Yancey as had the prosecution, that's an endorsement of the disclosure that had been made by Mr. Eller's counsel. And this, by the way, in conjunction with the – the other Federal constitutional error that occurred when the prosecutor comments on Mr. Eller's refusal to testify. He did not testify because he had –   It was a curation of instruction, I think. But there was something for me – I want to make sure I have the record read correctly. There was a curative instruction that was requested on the brutal error, but the court did not give it. Yes, Your Honor. What happened there? I mean, was there any colloquy? I don't really recall specifically why it was that the court did not give a curative instruction when one was asked. That might have made a difference here, I suspect. It would, Your Honor. I think it was a perfunctory request and a perfunctory rejection. I don't think there was much of substance said about it. But it was there. It was. The request was made and it was denied. It was. And that was not the case with the so-called Griffin error. There was no curative request that was made. That's true, Your Honor. I just wanted to clarify that. Yes. Just as a matter of curiosity, not that it makes a difference one way or the other, how long did the jury deliberate before it came in with its verdict, if you know? I don't know that, Your Honor. But I would point out in terms of the harmlessness determination, which is really what is squarely before the court here, the State Court of Appeal gave this kind of the back of its hand, you know, suggesting that the evidence was overwhelming against Mr. Yancey. But in fact, there was no other testimony. Yancey's testimony had been that he had gone home that evening and had been asleep at the time that this murder occurred. Mr. Ellard, by contrast, admits in his statement to police that he, in fact, is at the apartment building. He's been there earlier with Mr. Yancey and with the victim, Mr. Alexander. It's Mr. Ellard who makes the phone call from the apartment. So Ellard has placed himself at the scene of the crime in a way that Yancey never did. It's Mr. Ellard who ends up with the money, who makes the purchase of the car. Granted, Yancey and Ellard are together at that time. But the great weight of the evidence in this case pointed to Ellard as the killer and not to Yancey. The fact that they were together at the event. You are unable to say that if you take away Ellard's testimony, there would be insufficient evidence to convict him. Couldn't say that, Your Honor. In other words, there would be – I could not argue that as an interjection versus Virginia. There would be – I'm not trying to get you to argue that. But if you could do that, then prejudice would be – I mean, if that were the case, then you clearly would have prejudice. Absolutely. But short of that, the Supreme Court has been working very hard since you briefed this case to undermine your position in the sense that they've been issuing opinion after opinion, telling us that we must defer to the State Courts under AEDPA, particularly as to prejudice analysis. Most recently, of course, in Cullen v. Pinholster, a case from this circuit, where the majority goes to great lengths to speak not only on the – this was an ineffective assistance counsel claim, but then goes on to speak of prejudice. So I'm not quite sure what to do with that. How can we second-guess? I mean, we may not have reached the same conclusion as the Court of Appeal, but can we really under the standard – under the exacting standard the Supreme Court seems to expect us to apply? Well, I know – I mean, the test is all about objectively unreasonable, Your Honor. But it remains the case, as far as I know, that under BRICS, you know, undermine – it's something like a – it remains to be, at least as far as the Supreme Court has announced it, it is still a question of undermining confidence in the verdict, something like a Strickland standard. But in any event, I don't think it's ever been held that a petitioner doesn't – or an appellant doesn't satisfy BRICS – or let me put it this way, that a petitioner needs to establish by a preponderance of the evidence that the – that the verdict would have been different absent the error. That's not – that's really not the test. So it's not, I don't think, as it's presently been established, as demanding as – it's certainly less demanding than Chapman, but it's not – it's not a test that requires a petitioner to go that far. Well, the State court did not use the BRICS standard, did it? The State court actually, Your Honor, did not – it would – what it ought to have used was the Chapman standard as to these – as to the Bruton claim and the Griffin claim. It acknowledged that those were independent claims of error that Mr. Yancey was making. But you have the State using Chapman and we have to use BRICS. Well, actually, the State didn't use Chapman at all. I mean, that is one reason. What it really did use was something like BRICS, because it had analyzed everything under the – in the framework of its being a severance claim. So it said – it looked at the – which is a fundamental unfairness test. It said – it filtered the constitutional claims through the – Yancey's initial claim that he'd been denied due process because his trial was not severed from the other defendant. Having done that, it did not analyze Yancey's claims under Chapman, but rather looked at – looked at everything – accumulated or accumulated the errors and looked at them all under what is the equivalent of – or something similar to a BRIC test. Was the trial grossly unfair as a result of refusal to sever? So, in fact, there was never a Chapman analysis in this case. And that alone – or that's one reason to conclude it. They don't have to tell us that's what they're doing, do they? No, they don't. In fact, we have now another series of cases from Supreme Court that say they don't have to say anything at all. That's true. Except you lose. Well, the issue – No, I mean, I'm – No, I think that's – I think – These are the postcard denial cases. Yes. And what we have – and we have cases saying they don't even have to be aware of the standard. The question is whether, when the standard is applied, they're unreasonable in applying it. Yes. That's the test. I think so, Your Honor. But I think – I think that this Court does look at prejudice de novo. I mean, obviously, it defers to findings of historical fact, but it's a – whether or not it's prejudicial is a mixed question. It's looked at de novo, but with – always, you know, guided by the objectively unreasonable prong of it. But what reference do we give to the State court determination, which is what Judge Kuczynski is focused on? How would you respond to that? Well, my response is that analyzing the factors cited by the Court of Appeal as to why this was not prejudicial to Yancey, it's simply not persuasive. Objectively, it's unpersuasive. And if this Court – I mean, this Court doesn't advocate in those instances. If it strikes this Court as objectively unreasonable, it's not persuasive, which I think this must be. So it's an unreasonable application argument that you're making under AEDPA, I guess, right? Well, it's contrary or it's an unreasonable application of Brecht, yes, Your Honor. I mean, if that's what they were doing. Or if they don't say what they're doing, one would say that if they had cited Brecht, as Your Honor points out, they don't have to say what they're doing. But if – what ought to have been used would be a Brecht standard and – or actually in this State court, a Chapman standard. But if they can't even satisfy a reasonably applied Brecht standard, they lose. And I think they lose here because the factors that they – the evidence on which they rely, including Yancey's letters in which he never makes an admission that he's responsible for this, what does he come across as? Abusive, controlling, a not very pleasant personality towards Ellard? But does he – does he make an admission of responsibility? No. Is there any direct evidence – I mean, the evidence that he's in the apartment, well, which the State court of appeal relies on in part, yeah, that's conceded. He was there, both Ellard and Yancey were at the victim's apartment earlier on in the evening by the victim's consent. Both give that account. So the fact that there's physical evidence linking Yancey to the scene does nothing to establish that he was there at the time of the murder. Also the fact that he has a cover story that's consistent with the – with the physical evidence, oh, I was in the apartment earlier and that explains the DNA, doesn't get him off the hook either, right? Well, it's – it's in the sense that – I don't know if Your Honor is suggesting that the – that story is somehow implausible because it's only his account. I mean, Ellard gives the same – I'm not saying it's implausible. I'm just saying the fact that he has a – a – that there's an alternative version that – that explains away the physical evidence doesn't mean that that's in fact how the physical evidence got there. No, it doesn't, Your Honor, but I think – It could be that he – that that's how it got there, but – Yes. – FIROFAC can look at this and, of course, the court of appeal reviewing it can look at evidence and that's not how we see it. They can, Your Honor. I'd point out, though, that, I mean, to the extent that jurors might be saying, well, did he make this up to conform, you know, his account with what – what's known, there is independent evidence from the hotel clerk who sees Alexander and – and the victim and Yancey and Mr. Ellard come in together and Alexander checks them in to the – to the hotel room earlier on in the evening. I mean, all consistent with their having been at Ellard's place earlier – I mean, at Alexander's place earlier on. No, no. I – I understand, but that doesn't mean that he – I shall put it delicately that he left the DNA there at that time. He could have left it, I mean – He could have. I mean, it's – Later on. Yes. And we weren't there. We don't know, right? We don't. And – We have a jury. We have a court of appeal. We have a jury, but when the – when the process is corrupted or – or if something gets in front of the jury that oughtn't be there, then, you know, it's – was the evidence sufficient? Yes. Was – could a jury have resolved these credibility questions against Yancey? Had these errors not occurred? Absolutely. But what is on – what – what throws a wrench into the matter is when – when these things are disclosed to jurors and not only – you know, what this redacted statement says, that Yancey's up in the apartment by Ellard's account, that is the most powerful piece of evidence one could have against Yancey. And – Thank you. Yep. Thank you, Your Honor. We'll hear the mistake. May it please the Court, Doreen Jung appearing for the Respondent. I'd first like to address Petitioner's Bruton claim. It's established – it's been established in the State court and in the Federal District Court that there is an error that's been termed a Bruton error. Two errors. Two. I'm sorry? Two errors. Yes, that's true. Of course, Your Honor. I'd like to go in order if I could. Good to be accurate. Yes, that's – of course. If I could address the Bruton error. It's established credibility. It's important, Your Honor. I'm happy to concede that. So if we could look for a moment at the Bruton – what's been termed a Bruton error. What's important to remember is what – is that although this has been deemed a Bruton error, this is not an error in the – in the sense of the Bruton case itself. We don't have a confession in which one defendant has admitted his guilt and simultaneously implicated a co-defendant. But then this would make – the jury was told that he was in the apartment. Who cares what the vehicle is for getting that information, of course, to the jury? How do you parse this on that basis? I don't understand that. I would submit, Your Honor, that there's an enormous difference between having a confession from a co-defendant in which he admits his guilt and implicates his co-defendant. And a lawyer tells a jury that somebody was in the apartment. I mean, the lawyer is an officer of the court. Let me move on to something else, if I can. Your adversary relies upon the 2000 decision of this Court in Welchell and says that there's a case where we found that the error was not harmless, and says that his case is a stronger case for harmless error conclusion when you compare it to Welchell. Do you agree with that? Well, clearly, I don't, Your Honor, but the distinction turns on the same – the same issue I was discussing earlier, which is that there is a fundamental and enormous difference between a confession of a co-defendant. But I'm moving beyond that. Maybe my colleagues will come back to that. But I just can't wait to jump into Welchell, because I want your take on it. And I read it, I think, carefully, and it just seems to me that this case is a stronger case for saying that the error was not harmless than Welchell, where we said the error was harmless. And I just want to ask you a little bit about that. I have noted the following, that in Welchell, there was a reason for the jury to doubt the only eyewitness testimony. You had eyewitness testimony in Welchell, correct? I believe that's the case, Your Honor.  That's correct, Your Honor. In Welchell, you had a lot of people, six or seven people, you know, saying things that somewhat incriminated the defendant. And here you don't have that type of thing at all, necessarily, right? In Welchell, you had physical evidence. You had a purse that was found in the car and a knife as well. Here we had no question about it. They divvied up the money that was found in the car, I guess. But how do you really, you know, separate the facts in this case from Welchell? Well, it's – I am going to have to reiterate myself. I have to say that the distinction between Welchell is that in Welchell, there were multiple videotaped confessions of the accomplices in which they admitted their guilt and implicated the defendant. And I can only – if the court is willing to accept the premise that there really and truly is no distinction between argument and evidence, if the court is willing to accept the premise that there is really no difference between a confession of guilt and argument during closing argument, then you're right. There really is no difference between Welchell and the present case. I would argue that the primary difference is an enormous and fundamental one, that in Welchell, you have videotaped confessions that are subsequently introduced against a defendant, and that the defendant is then, Welchell, convicted by videotaped confessions of his accomplices. And that is simply not what you have in the present case. I understand, Your Honor, that you don't see a distinction between them. Are we arguing over form over substance? Let me ask you this other question. A curative instruction was requested on the Bruton error, and the court declined to give it. That might have made a difference here. I mean, how do you square that with how we're supposed to assess the merits of this case? The difference, Your Honor, is that in Bruton, you had an instruction which was designed to prevent the jury from considering the overwhelming effect of a confessing defendant who implicates his co-defendant. What you have in the present case is not that. What you have in the present case is, frankly, argument. And it's been frequently held, often held, that an instruction which or a curative instruction which simply calls attention to or exacerbates an error in the argument or a misargument can sometimes be more painful, more prejudicial, and more harmful to the defendant. The lawyer asked for it. I'm sorry? The lawyer asked for the instruction. It's true, Your Honor. The lawyer did ask for it, and it was denied. I'm simply saying that the denial in the present case can be clearly distinguished from faith. The judge was doing the lawyer a favor by denying it? I would argue that, Your Honor. I'm still not quite sure. I mean, this is your point about the distinction between this case and Bruton, the difference between confession and what happened here. I'm still not understanding the difference. In Bruton, you had a confession of a defendant who said, I did, in fact, engage in this, in criminal misconduct, and my co-defendant assisted me. What you had in the present case is a redacted statement of Ellard, who was attempting to exculpate himself, who was attempting to avoid culpability, and who never, in fact, fingered or identified Yancey as being the shooter or the killer or the executioner, if you will. None of those factors which are present in other cases. Let me make sure I understand what the difference is. You said one is a statement, one is a confession. Now, that's not the difference, right, whether you call it a statement, a statement, whether it's a confession or anything else, right? It's not a difference in the sense that we're – Let's just take one step at a time, what you've said. You've explained many things, many differences. I'm just trying to identify which one is the operative difference. The fact that one is called a confession and the other is called a statement doesn't matter, right? I would argue, Your Honor, if I could briefly, that it makes a difference. It does? It makes a difference in the context where we've already found an error. I've agreed, and the courts have found below, that there is something that amounts to a brutal violation, and it's been – and this falls roughly under that rubric. That said – I got that, but you're saying they're different. I'm trying to understand how they're different. If we have an error, and we're looking at harmlessness, if we're looking at a substantial injurious and injurious effect, my argument is that the statement is far less harmless, far less prejudicial, far less injurious than what you have in the actual Bruton case. Because one is called a confession and the other is called a statement? It's because in the harmlessness context – Yes or no? Is it because one is called a confession and the other is called a statement? No. Is that the difference? No. Good, okay. Not because it's called that, but because in the context of what we actually have, in the context of the evidence, which has actually been introduced. You can't stop with no. No, right? No. Okay. So the next thing you want to say is it's something about the content of the statement. Yes. Okay. And in the one case, in Bruton, the guy says, I did it, right? Yes. Okay. Whereas in this case, the guy says, I didn't do it. That's correct. Okay. And you think that's an operative difference? Yes. Okay. Why is that the case? Because in this case, we already have something amounting to an error. The question is whether that's substantial in injurious. No, but why is the fact that in one case he says something that's self-inculpatory? This is not our Petitioner. This is our defendant. Why does a statement where the guy says, I am guilty, more prejudicial than a statement that says, I'm not guilty? I mean, I would think that the statement where he says, I'm not guilty, suggests that somebody else did it, because the guy is dead. We know the guy is dead, right? Yes. So when the guy says, I did it, it seems to me that in some sense takes some guilt on him, and that would be the more prejudicial, the less prejudicial statement. Whereas if he says, I didn't do it, why isn't that, and you can't cross-examine him on that. I mean, that's the whole point of Bruton. You can't get him on the stand and say, well, if you didn't do it, who did it? Or, you know, you can't cross-examine him on his exculpation. So why doesn't this difference between self-inculpatory statement in Bruton and self-exculpatory statement here, why doesn't that difference cut against you? Why is that a difference that, if it is a difference at all, is actually shows more prejudice rather than less? I would take the language of Bruton itself is that a jury cannot overlook the power of a confession of guilt. And that is simply more powerful, more persuasive, and more convincing to a jury than anything else. The language of, or the logic of Bruton, therefore, would compel the obverse, which is that a self-exculpatory statement, a denial of guilt, is less powerful, and even if believed, simply helps the defendant. There's no prejudice that could result in either instance. So when you say the defendant, which defendant? In either one. In this case, either the, in this case, either Ellard, who's exculpating himself, or the resultant effect on Yancey. He's not exculpating, he's not exculpating Yancey, right? He did not inculpate Yancey. He's not inculpating himself, and why doesn't his self-exculpation, in fact, point the finger at Yancey? Because in the unexpurgated statement, which actually, the complete statement, which he actually did make to officers, he didn't do that either. So if the question is whether or not, why does the redacted statement, which removes Yancey from his statement and which was then introduced at trial, why isn't that inculpatory to defend, to, to Petitioner Yancey? The answer is that United States Supreme Court precedent has made it clear that in order to demonstrate a brutal violation, the nature of the, of the prejudice or the, the incrimination of the non-testifying defendant has to be facial. It has to be facially incriminatory. And through the redaction, we don't have that. So if the question is why doesn't Yancey suffer prejudice by being removed from, from an Ellard statement, the short answer is that, that is how the Supreme Court has defined brutiny. I'm unclear about something here that may be my own lack of, you know, awareness here. I don't know. Maybe you can help me. But if you remove the Bruton issue and you remove the Griffin issue, I just want to know what your position is. Is there enough evidence here to support this conviction? Absolutely, Your Honor. Why do you say that? Because the evidence is overwhelming that a robbery occurred in which Ellard and Yancey were involved and in which the defendant wound up dead and which, and in which the, the defendants took the money and showed up with, with the stolen proceeds in a different location. But why is, why does that mean that Yancey should be convicted of murder? I mean, he may be involved in robbery or something of that nature, but he says, I didn't know anything about this murder whatsoever. Ellard was the one that made the 9-11 call. Ellard was clearly at the apartment at the time. Just tell me. I mean, when I look at the record here, we'll have to deal with Ebter, I guess. But what do we have here? Tell me whether I'm wrong. We have the statement by Yancey to the police officer saying I'm pretty much fucked, right? So that could mean almost anything. That doesn't mean he committed the murder. It could mean that he was, you know, committed the robbery, I guess. Then you have all of this DNA evidence on Q-tips and on the beer bottle, et cetera, et cetera. But there's no question that Yancey was in the apartment maybe four hours before. So that certainly doesn't say that he was the one that murdered Alexander. Then last you have this testimony that Alexander was a neatnik. So, you know, he would have cleaned up all of the beer bottles, et cetera. That's basically what you think is substantial evidence to support conviction. I just wonder whether I'm missing something. I can only refer your honor to the felony murder rule. It's true, we can't identify Yancey as the shooter or Ellard as the shooter. We can't determine with any certainty who actually killed him between the two of them. I can only refer your honor to the felony murder rule and state that it's not essential for the court's determination or for the conviction or for this court to determine who the actual killer was. But in order for there to be a felony murder, I mean, doesn't it have to be evidence that Yancey had some knowledge or an awareness that there was going to be, well, a murder or that this person was going to be killed? Or was it just sufficient that he knew about the fact that there was a robbery, even though he didn't know about the fact that there was a murder and that's sufficient for conviction under the felony murder rule? I just want you to clarify that for me. Yes. That's how the yes, your honor. The felony murder rule works in such a manner that if the murder is a foreseeable consequence of the common objective of the robbery, then Mr. Yancey is guilty of felony murder. We have to show then that Yancey agreed with Ellard to rob Alexander Wright. That's true. There must be a right. What evidence is there that he agreed to rob him? Well, the most compelling evidence is the fact that they, they ended up with all the money in Los Angeles and they divvied up the proceeds. Is that sufficient evidence of the fact that Yancey agreed that they would rob Ellard? I would contend that that's very strong and compelling evidence. Indeed. Furthermore, is there anything else you have to support, you know, felony murder in respect to Yancey's involvement in terms of a robbery other than what you just told me? Well, furthermore, there are the letters from, which were introduced as impeachment. The letters to support a robbery, right? They demonstrate, they demonstrate his presence at the crime scene and they demonstrate that he was participating in a common objective with Ellard when he says things like. I just want to clarify what we have out there. So when we reflect upon this, we know we have the entire, you know, information that we should reflect upon in terms of sorting this out. So I just wanted to give you the opportunity to explain that. Well, Your Honor, the record is voluminous. I can't, I can't do that in the time remaining. But I would simply, simply point out the fact that, the fact that we can't identify either Yancey or Ellard as being the particular shooter is not relevant in the context of a felony murder conviction. If there are any further questions, I'm happy to answer them. But you do, you do need some proof that they set out to rob together. I'm sorry, Your Honor? That they set out to commit the robbery together. Yes, that's correct. So if they go out and they plan to do the robbery and it goes wrong and turns into a, somebody gets killed, they're both on the hook? Yes. And what's your best evidence on the setting out together? You rely upon the fact, I think you just told me, that they had the money and they divided up the proceeds and he wrote some of these letters in jail. That's it, right? That's not the only thing, Your Honor. I mean, it's very compelling. I mean, there's a long and continuous transaction in which no one else is present, in which the defendants accompany Mr. Alexander to his apartment, in which they engage in a long social engagement, in which they tell the defendants about the existence of the money, in which they found in a motel room. And because there is a long and continuous transaction, because there appears to be no one else who could have or would have committed this crime, and because there is no compelling or factual evidence that could support the alibi, which, you know, the defendants did attempt to provide an alibi of a skinny male or a skinny male. So you're saying that there was money there that they found and he was aware of that before the murder took place? Yes, Your Honor. And you rely upon that to support the robbery nexus, so to speak? Yes, Your Honor. Okay. Thank you. I think we're pretty much out of time. We'll give a minute for a bottle. I just wanted to add one thing. Your Honor, you asked about the curative admission. I am not recalling the content of it, but it appears at Rt. 1425, and I just wanted to alert the Court to that. This is what? The curative admission. You asked about the exchange on the curative admission. I just wanted to cite to the record where that occurred. That's all I wanted to add, because you had a question about that. Oh, gosh. Wow. Okay. Thank you. Thank you, Your Honor. How'd I do that, huh? Be careful. Should we take a little recess until we see you again? I think we should. That's a trouble. Why don't I take a recess before the next case? All rise.
judges: Block, Kozinski, Smith N. R.